Dr. 2-14-0618, Jamie Doe on behalf of Jamie Doe, a minor, appellee of the Catholic Diocese of Rockford, and John Doe, appellant. Bargain on behalf of the appellants, His Honor, Mr. Henry Jensen. Bargain on behalf of the appellees, Mr. Phillip Piscopo. Good morning, and Ms. Jensen, whenever you're ready. May it please the court, counsel. My name is Kim Jensen, and I am arguing on behalf of the respondents, the Catholic Diocese of Rockford, and John Doe. I'm joined at council table by my colleagues Gregory Snyder and Jennifer Johnson. I want to focus primarily today on the sufficiency of the petitioner's Rule 224 petition. But before we can get to that, I do feel like I need to address as a preliminary matter the application for leave to amend that pleading on appeal. The petitioner has argued that it's necessary to file an amended Rule 224 petition so that she can include some additional factual allegations that were not included in the initial pleading. Were they heard at the trial court level? The facts that they would like to amend to the pleading were reflected in various evidentiary exhibits that were attached in response to the opposition. I would suggest that the motion itself or the application itself is sort of a tacit acknowledgement that the original petition on its face does not contain sufficient facts to state a defamation claim per se. With respect to ruling on the petition to amend, we can enter any order that the trial court could have entered, correct? Certainly. And this is a discovery proceeding before the filing of any formal complaint, correct? Yes, it is. And the trial judge heard these facts, most of the facts that are contained within the amended petition, correct? Actually, all of the facts, correct? Most of the facts contained in the amended petition were reflected in the exhibits that were presented to the trial court. And the court considered those? I believe so, yes. With the exception that the court below did rule that under the appropriate standards for review of a Rule 224 petition, as this court has held essentially the same as reviewing under Section 2-615, reviewing a complaint on its face, the factual allegations of the complaint. So the court did, although we had presented certain factual and evidentiary matters in terms of affirmative defenses, the court said, you know what, that's 2-619 type material. We don't really consider that in reviewing the sufficiency of an initial pleading. In reviewing an initial pleading, we look at the face of the pleading. Aren't the diocese talking out of both sides of its mouth? On the one hand, you're asking us not to look outside the four corners of the petition. But if we do rule that the petition, standing on its own, passes 2-615 scrutiny, then he wants to look outside the four corners of the petition and rule on clergy privilege, correct? Well, the clergy privilege is a separate issue. Correct. Correct. So we're looking only at these facts that are in the petition for your purposes. But then if we decide that the petition sets forth enough information to pass 2-615 scrutiny, you want us to look outside the petition and examine clergy privilege to reverse the child court, correct? That is correct. And then I don't think that is really talking out of both sides of our mouth. I think it's really two separate issues. In order to be entitled to discovery under Rule 224, the initial pleading does need to survive 2-615 scrutiny. But the clergy privilege, we're arguing, is an additional defense to disclosure. It's an additional privilege that even if it does meet the 2-615 standards, if the privilege applies, that would be a separate basis for denying discovery. Isn't the holding in Maxson v. Ottawa Publishing and in Hadley that a 224 petition must withstand 2-615 scrutiny? Doesn't it make sense in light of the fact that this is supposed to be pretrial discovery, liberal discovery, extensive discovery? I think it does make sense, and I think this Court has sort of set forth the sort of rationale for having that sort of strict construction, that strict standard for granting a 224 petition. But in Hadley and in Maxson, there are different cases because there, there was the First Amendment protection for anonymous political speech. That's not an issue here, correct? Well, it's not anonymous political speech, but there's still, it's still anonymous speech. There's still some protection, but this is not political. This is not in the political context. This is a personal accusation against a private party, correct? It is, it is. But before the diocese should be compelled to disclose the identity of the party making those statements, the drafter of the letter, there is still a burden to show that that disclosure of that identity is necessary. And for that identity to be necessary, there has to be a viable claim for, for defamation per se. You would agree that defamation per se includes accusing a person of committing a felony offense, correct? Yes. Doesn't the writer accuse the child, Doe, of committing a felony offense, separate and apart from sexual touching, by accusing him of committing intimidation, a felony under Illinois law, that he's going to beat this person up if he tells anybody? I don't think the complaint suggests that. The complaint says it explicitly. The complaint says that the... He would beat the person up if he told anybody. That's intimidation. Are you familiar with the intimidation statute? Yes, Your Honor, if I may. The complaint says that it is based on the petitioner's characterization of a description of the letter by the diocese. So we don't actually know what the letter itself said. But even to the extent that even if we were to take... Well, you know what the letter says. The complaint doesn't know. I personally don't. I believe the client certainly does. The client knows. Certainly. But it's not our obligation to disclose the letter. And, of course, this Court construes an allegedly defamatory statement de novo. So even the diocese's characterization of the letter is not the statement that's at issue. But even looking just at the face of the complaint, it doesn't say that the young man threatened to beat the other man up. It says threatened with harm. And it doesn't specify in the actual pleading itself what type of harm was threatened. But if they don't have ‑‑ if Jane Doe doesn't have the letter and it is the diocese's interpretation or characterization, as you say, of the letter, isn't that what you've set up in that characterization, a threat of harm as one of the allegations? We don't know what type of harm. You know, these are children. Harm could be anything as innocuous as I won't be your friend anymore. It can be I'll tell the teacher. Harm could mean any number of things. And I think before we even worry about what type of harm, for it to be a felony offense, for it to be an indictable offense, the young man would have to have been over 13 years of age. And there's also nothing in the pleadings to suggest that this young man was even old enough to commit an indictable criminal offense. It's the act that you accuse the person of, not the age of the parties. Well, it can't be a criminal offense if the offender is not capable of committing a criminal offense. Do you have a case law that suggests that? Well, the cases that we cited indicate that for it to be imputation of a criminal act, it has to be indictable, punishable by death or imprisonment. So if the acts of a 7‑year‑old or 8‑year‑old or 9‑year‑old or however old this child was. Do you have the precise language in front of you, the allegations in the 224 petition with respect to the harm? Yes, I do. That J. Doe threatened the other child with harm if the other child told anybody about the touching. And you're suggesting that that does not set out an intimidation? I am suggesting that. Every reasonable inference, every fair inference should be drawn in favor of the plan. Do you agree with that? Yes, I do. That's the law. Yes. Yes, I don't. If you take that together with the allegation of sexual contact, you don't see that that inference is fair. Although the diocese drew that exact same inference, you don't think it's fair for us to draw that inference? Well, I don't know that the diocese drew that exact same inference. How about the letter? The letter from the? From counsel. Counsel for the diocese did characterize it as a, you know, if you bring a lawsuit that it's going to come out that there was a report of criminal sexual abuse of a minor. Again, I don't know what statement counsel was reviewing when she reached that conclusion. Her construction. How about the language? The parish is not permitted to ignore the report about the child and adhere to its duty to protect all children. The parish received allegations of sexual abuse of a minor. That's the way the diocese interpreted it. That's one attorney's construction of a statement that's not before this court. The attorney speaks to the diocese representing the diocese, correct? Sure. Okay. And that's really the only information that Jane Doe has that we know of. And from the characterization of the diocese. So if we don't use the characterization of the diocese or that Jane Doe doesn't, how can she pursue a 224 petition since she doesn't know anything else? I don't know how she can. I do know that the standards are that she must plead the statement with sufficient specificity to permit judicial review of whether or not the statement made by the writer, him or herself, constituted defamation per se. This isn't strictly about protecting the diocese. This is also protecting the anonymous writer who made statements in a letter that aren't before this court. That this court has not had and will not have any opportunity to review or construe. There's nothing in this record that would permit this court to determine that the actual statements made in the actual letter sent by the letter writer constituted defamation per se. The construction by a diocese attorney is simply that, the construction of one person. This court is the body that's entitled to provide the definitive construction of an allegedly defamatory statement. But you cannot do so because that defamatory statement is not part of this record. In Hadley, this court determined that the statement, Hadley's a Sandusky waiting to be exposed. We determined that that was defamation per se. How is this different? I think the analogy to saying that somebody is a Sandusky waiting to be exposed is a fairly direct statement or implication that somebody is criminally abusing minors. There is no direct statement here by the writer for this court to review suggesting. There's a direct statement that's alleged in the petition, it's sexual contact with a minor, correct? Sexual contact between two minors, yes. That's not criminal offense, a criminal offense. Mere sexual touching is not an indictable criminal offense. As we cited in our briefs, for it to arise to a criminal offense, even assuming the child is old enough to be capable of committing a criminal offense, it would also have to be a touching done for the purpose of sexual gratification or arousal. In Bryson, there was no explicit description of the acts other than to characterize the plaintiff as a slut. And that was defamation per se. Based on reasonable inferences that could be drawn, all fair inferences in favor of the plaintiff's position, correct? And the court in Bryson determined that calling someone a slut was a charge of fornication. Fornication is, in fact, a category of defamation per se. Mere sexual touching is not. And fornication is something specific under the law. It's not mere sexual touching. It's not mere sexual activity. And fornication or adultery is actual sexual intercourse outside of the bonds of marriage. A sexual touching in this case. Sandusky, waiting to be exposed, was not accusing a person of sexual intercourse outside marriage. It was an accusation of sexual contact with minors. Sure, and that's under the separate category of imputation of a criminal offense. And again, in this case, the mere sexual touching that's been alleged is not a criminal offense. It's not a criminal offense. Even though the touching, after the touching, there was a threat of harm to the victim if the victim told. So isn't it a fair inference? We don't read those statements in isolation. We read them together and determine all fair inferences that could be drawn from them, correct? Absolutely correct. But I still don't believe that that sets forth a criminal offense. For it to be a criminal offense of a criminal sexual abuse of a minor, again, the sexual touching had to be conducted for the purpose of sexual gratification or arousal. There's no suggestion in this record that that's the case. In fact, there is the suggestion in this case that the petitioner has put into the record that there was, in fact, some sort of actual incident that occurred that did, in fact, involve some sort of sexual touching between the minors. And the petitioner has characterized this as an innocent child exploration, sort of normative play, playing doctor, that kind of thing. We have no way of knowing whether or not the letter writer's letter simply related exactly the incident that that petitioner has acknowledged has occurred or whether they imputed something completely different. The child was removed from religious education, correct? Yes, but that was not based on the letter. That was based on the pastor's conversation with the petitioner, with the child's mother. If you go back and look at the letter. I've looked at the letter, but I'm just saying this whole issue began with the writer's statements in the letter, correct? Yes. And as a result of that, the allegation is that the child suffered, was removed from the parish, et cetera, from religious education, correct? That's alleged. Well. That's alleged, correct? It is alleged that he was removed from the religious education. If you look at that letter. Isn't it fair to also consider that in determining whether or not a criminal offense was alleged? The reaction by the parish. But again, the reaction by the parish, the reaction by the parish was simply to call Jamie Derwin, call the mother in and say, I've gotten this letter, what happened? After that conversation, the parish's actions were based on what Jamie Derwin related about the incident that occurred. Certainly, I think if the pastor had thought that there was a criminal act that had occurred, I would hope that the pastor wouldn't simply remove the child from religious education or take measures to have an adult supervision, those sorts of things. I think if the pastor thought that there had been an allegation of some sort of criminal act, there would have been some sort of reporting, whether to the authorities, to DCFS. Yeah, I certainly hope that the parish doesn't simply. The pastor shared information that was in the letter with Dole's mother, correct? That is my understanding, yes. And isn't that a way to move on to the next issue? If we were to decide that this passes 2615 scrutiny, how is that communication protected under the clergy penitent privilege? That was going to be my question. If I could just ask more specifically, wasn't the purpose of the disclosure here not to receive spiritual counseling, but instead to find out how to handle the situation? Wasn't really that more in the nature of risk management rather than some sort of confession or need for spiritual counseling? As the pastor characterized it in his affidavit, it was a request for advice about church law, ethics, and policy. And I think it does sort of commingle, you know, how do we handle this in terms of risk management, what are my obligations as a Catholic in the parish, what is the church law with respect to that? I think it probably involves elements of both. Since this is a, going back to the original concept, that this, the defamation claim stated here has to withstand a 2615 motion. Yes. But you said an additional layer is the privilege. If we rule on the issue of privilege as a result of this proceedings, that ruling stands in the rest of this litigation if it goes forward, correct? Yes, I believe so. All right. So you could not raise it as a 619 at a later time? I believe that would be correct. Okay. Yes. All right. Clerical privilege, like any other privilege, can be waived. Do you agree with that? I agree. And here the pastor, at least with respect to what he shared with Doe's mother, waived the privilege from his perspective, correct? To the limited extent of whatever. The communication, whatever it was, he's waived it. And the diocese asked for permission to provide notice to the writer, which you did, correct? Sure. And the writer, unlike Hadley, where Hadley, in Hadley the defamer, appeared by counsel and asserted First Amendment protection. Here the writer, who is a member of the flock, has decided not to appear anonymously through counsel and assert privilege, correct? That is correct. So where is the privilege? It's been waived by the pastor, and the penitent or the member of the flock has an opportunity to raise privilege and has declined to do so. We don't know precisely. Even if it were covered by the clergy penitent, if it was a confession or admission. Hasn't it been waived in this setting? We don't know precisely how much or what part of the letter the pastor actually disclosed to Jamie Doe. I don't believe that simply saying I received a letter about this general subject would constitute a waiver of the entire confession. And certainly if the pastor had disclosed the entire contents of the letter and waived the privilege as to the entire contents of the letter, then we wouldn't be in the position of evaluating whether or not it was sufficiently pled that Jamie Doe would know. How about this hypothetical? What if the letter was not referenced to a child, but referenced to a priest who had done some improper touching of a child? Would the church be allowed to raise clerical privilege? I suppose it would depend on the context in which… In this exact same context, that the person in the bathroom with the boy was a priest, not another boy, who touched a boy. Would the church be allowed to assert clergy penitent privilege in that setting? I don't believe so. Right. And why? Because it's not covered by clergy penitent privilege. And the members of the church, the clergy, are now mandated reporters under the Abuse and Neglect of Child Reporting Act, correct? Correct. So we treat it differently when it's a member of the parish who's reporting contact between two minors. And I think that the other distinction there, too, is that if we're talking about a priest, then we're talking about a clear criminal act. You know, a priest improperly touching a child sexually, I don't think we'll have any debate that that's going to be an indictable offense punishable by imprisonment greater than a year. Right. But in either case, how does clergy penitent privilege protect that kind of information? I just don't see it. There's no admission. There's no confession by the writer. The writer is just simply seeking guidance. It's not to relieve her or him from the consequences of a grave sin. It's to get advice on how to move forward. Well, without knowing the full context of the letter, we don't really don't know to the extent that this letter writer is seeking spiritual guidance. What are my obligations? Spiritual guidance is not enough under the law. Are you familiar with a single case that says clergy penitent privilege covers merely spiritual guidance where the person is not in a position of confessing or making an admission? Not outside of a confession or an admission. Right. Sure. But I don't know. What would the writer be confessing or admitting to? I mean, theoretically, what else could there be that is a confession or admission by the writer? Well, I think it's Niagara v. Poplar, the court, so that it doesn't have to be a confession in the sense that we think of confession in the criminal sense. I confess to a crime. Confession in sort of the Catholic theological sense is somewhat broader than simply admitting sin. An acknowledgment of some wrongful behavior that you need guidance for. Well, it's seeking guidance from the court on what – or from the court – from the church on what is and is not my obligation under the church law. Is it appropriate under canon law for me to just bite my tongue and sit silent? Do I have an obligation under the laws of the church to come forward, to say something? I think that's an appropriate thing to raise with your priest in the confessional. I don't think that we can really confine – It should be so restricted, you mean. Exactly. I don't think we want to set limits on what is appropriate to disclose to your priest in the confessional sense. You'll have an opportunity for a response or reply. Oh, thank you. Mr. Piscopo? Thank you. May it please the court and counsel, I represent the petitioner in this matter. And in reviewing this, the real problem with the appellate's arguments is that there's no case supporting really any of them. In fact, it seems like they want this court to be the first court to do a whole bunch of things with regard to this case. Well, this case is different than some of the other ones that have been decided in that we don't know what the statements were in the letter. We only have a characterization of those statements by another letter. Sure. But how, then, can you, representing Jamie Doe, with specificity, identify defamation per se? Well, there are two cases that answer that question. One of them is the Green case. In the Green case, it did provide for a level of particularity with regard to defamation cases, but it also emphasized that we're not saying that you can't plead things on information and belief. If we did that, then the only time you could ever have a slander case is if the plaintiff was personally present when the slander was made, or the only time you could have a libel case is when the plaintiff personally read the libel. And so the Supreme Court said that wouldn't make any sense. We will allow a plaintiff to plead on information and belief so long as they state the basis for that belief. All right, but where, I guess, my question is, if the only place you are getting this information to form your belief is someone else's summary or characterization of the letter, how do we accept that as being able to withstand this scrutiny for a 2615? Well, in essence, it has to come from somewhere. And there was a case, the Dubrain v. Marshall Fields, which cited a Supreme Court case, Colson v. Stee, that said that the courts focus on the effect of the publication on the person who heard it or the person who read it. And here we have the effect of the publication on the person who read it, namely the pastor and ultimately the diocese, which imposed restrictions on him. They wouldn't let this child go to the bathroom without adult supervision as a result of these allegations. And they did give specific statements as to what was said. They said that it was a sexual, improper sexual touching. And they expanded on that. They said it was actually a touching and filing of the genitals, coupled by threats of harm, which Justice Burkett has explained in the first colloquy here. Well, notwithstanding that, we do look at the four corners of the petition. You agree with that, correct, in deciding whether or not a 2615, whether or not the petition withstands 2615 scrutiny? If it's strictly a 615 motion to dismiss, then yes, I would agree that you look at the four corners of the complaint. There is some case law that suggests that you can look at admissions elsewhere in the record that were previously made, but generally a 615 motion would be based on the four corners of the complaint. And the diocese is arguing that by requesting permission to amend the complaint here in this court, that's an admission that the original petition is insufficient on its face. How do you respond to that? That's not an admission of the selection at all. But I do have to be ready in case this court were to agree with the diocese on that ground. But, however, I do believe and I do submit that the petition was sufficient. The petition, in fact, I argued that on page 13 of my brief. It said that there was an improper sexual touching, which is sufficient under Green to allege something, and it's also sufficient under the Hadley v. Doe case where the person simply, or where the person said it is a Sandusky way to be exposed, as you pointed out in the first argument. So the reason for the amendment request is what? The reason for the amendment request is if this court were to find that the original petition needed more detail than what was in there, then I would like to amend it to include the things that were put into the record before Judge Ackerman made his ruling. You were actually ready to file the amended petition in the trial court, correct? It wasn't drafted yet, but I asked for leave to do it. But you asked for leave and Judge Ackerman decided he didn't need it. He didn't need it, but it would have been a fairly simple matter to put those things in if Judge Ackerman wanted it. You know, I was thinking about this argument that the diocese made about the age of the child. Would it be a defense to defamation if a person said your son, your 8-year-old son, burned a garage down or committed some grave act? Can you still commit a tort of defamation per se by accusing a minor child of something falsely that would otherwise be a felony? I would say so. Does it make sense that we treat, for purposes of defamation, you can't be a victim of defamation unless you're of age? Does that make any sense? Indeed. I don't believe that makes any sense at all. Your 8-year-old son shot the next door neighbor. Well, that's not defamation because he's not old enough to be charged. Does it make any sense at all? No, it doesn't. And the reason is the defamatory statement is the crime, not the illegal defense somebody might have that I can't be charged with a crime. It's still an indictable offense even if he was only 8 years old. And that's one of the places where they have no cases that say— You didn't put that in your brief. I just was asking that question because it seems to me to be silly that you can't be the victim of defamation per se unless you're 15 or 13. Years of age. Respectfully, I believe I did put it in my brief, but that's my argument is that it's not open season on children just because they can't be indicted. But that's one of the things that no case has ever held that. And also, yeah, and also no case has ever held because they're demanding all sorts of these specific details. Never mind that in handling Sandusky waiting to be exposed was good enough. They didn't have to specify what type of sexual conduct or misconduct there was. And there are no cases saying that improper sexual touching isn't good enough. And that was in our original petition, not in the amendment. Well, Sandusky waiting to happen, that was pretty obvious because we know that was about the time of this publication by the anonymous blogger or whoever it happened to be. We knew who Sandusky was. We knew what the allegations were. What we have here could be a bit murkier, especially if Jamie Doe, when speaking with the pastor, says, well, it's just, you know, it's just boys being boys or something like that. Did is that something that was that was said? Is that something that was said? I don't believe so. She absolutely denied saying any of those things. And she had never heard of this before. It was not a boys versus boys. That might have been a characterization by my counsel, not me, my partner, but that maybe that's all it was. And that was that was what we were claiming that their characterization was. But they never characterize it that way. They characterize it as fumbling of the genitals and saying that I'm going to hurt you if you tell anybody else about it. That's a classic case of sexual abuse of a minor. Going back to that, to that Sandusky matter, one of the things that the defendants in that case argued was that, well, nobody knows who Sandusky is. Maybe they're just talking about the town in Ohio. And the court said, come on, that doesn't make any sense. No, that's where Cedar Point is. They wouldn't be talking about that. Of course not. That's an amusement park. Exactly. But they were using that to say because they were saying that you have to have exactly you can't look at anything else in order to determine what the what the defamatory statement was. And the appellate court said that this court said that's nonsense. And that's what that's what the defendants are doing here. They're asking for all sorts of details that are not germane and do not form the gist or sting of the allegation. Like they want to know what specific harm was threatened. They want to know the sizes of the children and their exact ages. We allege that that our client's child was was accused to be older and larger than the younger child in the letter. That's that's certainly specific enough. And no case has ever said otherwise. And they even want to know who it was who provided the description of the letter. Well, first of all, that's not necessary in a pleading. And second of all, we did. Master Doe and the diocesan attorney, they both they both personally told either petition the petitioner or petitioner's counsel exactly what was said in this letter. With respect to the clergy penitent privilege, how do you respond to counsel's response to my question about the purpose of the disclosure that there was a dual purpose with respect to asking the question? That is not only risk management, but some sort of spiritual counseling, which may then have brought it within the privilege. Well, that's the first time that this dual dual purpose argument has ever been mentioned. But what my response is that the purpose is it has to be for spiritual counseling. That's one of the three. So is that what you're saying solely? I would say so. If there if there's some parts of it, there's spiritual counseling and some parts of it that are accusing somebody else of wrongdoing, then perhaps a spiritual counseling that could be redacted out and the rest of it can be would be revealed. But there's no indication that this is really for spiritual counseling. Pastor Doe's affidavit simply says that that the writer wanted to know about church law and policy. Well, there's a whole book in church law called the Code of Canon Law that anybody can look at. They could even read in the original Latin if they wanted to. And that and the church law doesn't talk about spirituality. If you want spirituality, you go to the catechism for church law that shows like how bishops are appointed, what happens, like how to make an invalid marriage, all sorts of things like that, how a parish administers its goods and monitors the conduct of people. That sounds a lot like a legal system. And in fact, it is a legal system. There is nothing anywhere in this record that shows that this writer in talking to Pastor Doe was trying to find out how to become closer to God or how to conform her life in accordance with the church's moral teachings. This was this was it was really akin to I saw the deacon stealing money from the offertory and I need to know who I should tell. It had nothing to do with any sort of spiritual counseling. And even then, that's only one element of the privilege. There's the two other elements. It has to be an admission or confession. And there's no indication here that the writer was admitting or confessing anything. She was simply lodging an accusation about somebody else. That's not an admission or confession. It's a it's a it's an accusation. And then the third one is that the is that it has to be under the rules of the religion regarding confidentiality for that spiritual counseling. And here we have this pastor went and told several people about this. This was not going into the confessional where the priest under Catholic law, that's also in canon law, is not supposed to tell anyone if he does his excommunication. Well, he did not tell anyone. He told he told our client some aspects. He told diocesan attorney about those aspects who then relayed those to us. Under those circumstances, and I have some case law in the brief that shows that Pastor Doe, when the when the chips were down, he did not believe that this was something that he had to maintain strict confidence on pain of excommunication. He thought it was OK to use the letter to to put restrictions on our client's child and to tell others about it and explain the reasons why. That's not what you do in a confession. That's what you do when you're trying to conform with what you think is church policy. And I would note that they say in a case called Snyder versus Poplett saying that that talks about acts of the third party in that. And they seem to want to expand that to say that any basically any time a person talks to a priest about an important matter, then it's not going to. Then it's going to be privileged. But in Snyder, the it was a will challenge and the person was simply she went to see this clergyman every single week or every other week for many, many years. And once in a while she said something about her will and they wanted the pastor to talk about it. And the proponents of the testimony said, well, this concerns acts of third persons. Well, they never specified what those acts of third persons were. The case never says what those acts were. But the primary purpose of that was for spiritual counseling. And so therefore, the court held that privilege. And that doesn't mean you can simply expand that to say that any time a person talks to a priest or or or another clergyman that that's something the privilege applies. And that's yet another place where no case has ever has ever held that. And with respect to waiver, with respect to waiver, that wasn't addressed by by either party. But I do know that the writer was given notice of these proceedings and never did come in to to to assert the privilege. With all due respect, I'm not sure that that the pastor can really waive it by talking about it himself. But the writer never did. The writer could still assert even if the pastor did, the writer could still come in and assert the privilege. Right. The writer can still say that the pastor, you did something wrong by exposing that. But the writer never did do that. So and the writer was given the opportunity at the request of the of the diocese to do that and never did. So even the writer didn't think that it was protected under the clergy privilege. I don't know if it's so much waiver as it as it's evidence that the privilege never applied in the first place. So I mean, waiver is a distinct legal action, of course. And I think that the actions of both Pastor Doe and the supposed penitent show that they never intended that this ever be privileged in the first place. So I would ask that this court affirm the trial court. Thank you very much. Ms. Jansen. First, with respect to the necessity of the amendment, counsel's argued that he's not acknowledging that the initial petition was insufficient, but simply saying that if this court finds that the initial petition were insufficient, that he would like to amend the petition. Respectfully, I would argue that it's not necessary to allow leave to amend on appeal. If he believes he should have an opportunity to pursue an amended complaint, he could certainly have asked for that this court, if you find the initial petition was insufficient, to remand with instructions that he be granted leave to amend. But to amend it on appeal, while it's on appeal, would be profoundly unfair to the respondent. This proposed amended pleading was never before the trial court. We had obviously no opportunity to challenge that pleading in the trial court. We didn't even have an opportunity to challenge that pleading in our opening brief to this court, as the application was not filed until at the time that the petitioner filed. But you did, as you said before, know about these issues because they were in evidentiary exhibits that were before the court, and I assume you had them as well. They were in evidentiary exhibits presented in response to our opposition to the petition. We certainly didn't have the opportunity to address these facts as allegations of a petition, to address whether or not if these specific facts had been alleged, whether they would be sufficient to state a claim for defamation per se. And really, to amend it on appeal would effectively put this court in the position of determining the sufficiency of this new pleading in the first instance, rather than actually reviewing a ruling of the trial court, which the trial court reviewed the initial petition. So I would respectfully request that application for leave to amend on appeal be denied. With respect to the clergy privileged, you know, counsel sort of suggests that maybe we can kind of redact out those parts of the letter that are seeking spiritual counsel, spiritual guidance, and those parts of the letter that are accusing a third party of some sort of offense. I'm not comfortable with putting those sorts of restrictions on the confessional. That issue is not before us now. The 224 petition only, if we affirm the trial court, all they get is the identity of the writer. Those issues really haven't been, you know, we don't have the letter, so we would not be in a position to parse out what is or is not privileged, correct? I think that's probably fair, yes. I think in answering Justice Hutchinson's question earlier, you acknowledge that if we reach the issue of privilege, that will be the law of the case. That's true. And we don't have the letter, so that's a catch-22 for you, you're asking us to rule on that. Not necessarily, because if any part of that letter is privileged, the identity of the confessor is also one of the confidential things. The fact that I'm the person who went to see the priest, that's also part of the confidentiality. In other words, and I think you said you haven't seen the letter, we don't know if there might be something in the letter in addition to the information we already know that might constitute a confession or admission of something we don't know, correct? Correct, correct. And, you know, I think it sort of creates a chilling effect if this court were to say that, based on sort of the vague allegations that we have, that the parish is obligated to disclose the identity of a writer who sought guidance from the parish priest, then who's going to come to their parish priest with concerns about these types of issues? There's going to be that chilling effect. Gosh, you know, if I say something, is this going to put me in some sort of legal risk? And I don't think that's something that we want to do. No, we're cautioned not to address issues that have not been raised for this very reason, but you raised it. You raised it at the trial court level, and you raised it here. And so if you were concerned about maybe not being able to have a second stand on this issue, why would you raise it now, the client or the clergy penitent privilege? Because part of that privilege includes the disclosure of the identity of the person who provided the information to the priest. If we don't raise it now, there's no way to raise it to protect that parishioner from the disclosure of his or her identity. Well, you just said that there might be if, in fact, this is a true penitent. Once the letter is identified, that would be the next step, I suppose. If that person truly is repenting for something that may or may not be criminal, I mean, from your perspective, your argument, we don't know anything, then, you know, why would you have to raise it now? If the privilege protects against the disclosure of the individual's identity, I don't know how we could raise it at a later date if, you know, after the fact that the writer's identity is disclosed, the harm is done, the bell can't be unrung. So if we don't raise it now, raising it after disclosure is compelled would be too late, I think. Counsel questioned whether or not there was any reference to Jamie Doe having acknowledged some sort of incident of an improper touching. And so I just wanted to quote the portion of the petitioner's brief where that acknowledgement was, in fact, made. It's at page 20, and Respondent writes that, can be innocently construed as normative sexual play. That argument lacks merit. And Petitioner goes on to say, Petitioner's counsel was referring to the incident, not the writer's statement about the incident. So there's been an acknowledgement that there was some incident, that there was some incident that was discussed between Jamie Doe and the pastor. Again, we don't know. Was it normative sexual play? Was it something more nefarious? I think it's fair to assume, to give it the innocent construction, that it probably was a normative sexual exploration between two children. And there's no basis from what the petitioner has alleged in her complaint, or even in her amended complaint, to suggest that it was anything more than that. So respectfully, unless this Court has further questions, I would ask that you reverse the trial court. Thank you. Thank you. Thank you both for your arguments this morning. We will take the matter under advisement. We will issue a decision in due course.